IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| VS. | ) | CRIMINAL NO. 2:05-CR-119-F |
| | ) | |
| DON EUGENE SIEGELMAN, | ) | |
| PAUL MICHAEL HAMRICK, | ) | |
| GARY MACK ROBERTS, and | ) | |
| RICHARD M. SCRUSHY. | ) | |

## SECOND MOTION FOR JUDGMENT OF ACQUITTAL
## ON BEHALF OF MACK ROBERTS

Comes now the accused MACK ROBERTS, by and through his undersigned counsel and moves this Honorable Court pursuant to Rule 29, *Federal Rules of Criminal Procedure* to enter a judgment of acquittal to each and every count of the indictment on the grounds that "the evidence is insufficient to sustain a conviction" of the offense(s) charged in the indictment. Despite having called numerous witnesses and introducing numerous documents, the Government failed to offer any evidence--circumstantial, direct or otherwise--from which a rational juror could find beyond a reasonable doubt that Defendant Mack Roberts committed the crimes with which he is charged. As grounds for and in support of his motion, Roberts states as follows:

## OVERVIEW

"The standard by which the Judge is to be guided in passing on a motion for judgment of acquittal is the same regardless of whether the motion is at the close of the government's evidence or at the close of all the evidence or after discharge of the jury." Wright, *Federal Practice and Procedure: Criminal 3d,* § 467. As stated in our prior motion, a Motion for Judgment of Acquittal pursuant to Rule 29 tests the sufficiency of the evidence against the defendant and avoids the risk that a jury may capriciously find

him guilty though there is no legally sufficient evidence of guilt. Wright, *Federal Practice and Procedure: Criminal 3d,* § 461. The motion for judgment of acquittal at the close of the government's case implements "the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense." *Id.* at § 462. A motion for judgment of acquittal must be granted if "the evidence is insufficient to sustain a conviction" of one or more of the offenses charged in the indictment. *Id.* at § 466. In other words, the motion should be denied only if there is "relevant evidence from which the jury could properly find or infer, beyond a reasonable doubt that the accused is guilty." *Id.* at § 467. The jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt. *Id.* at § 467. According to Wright's *Federal Practice*, the appropriate test to be applied to motions for judgment of acquittal in all circuits (except the Second Circuit) is as set forth in *Curley v. United States:*

> If the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge must require acquittal, because no other result is permissible within the fixed bounds of jury consideration. But if a reasonable mind might fairly have a reasonable doubt or might fairly not have one, the case is for the jury, and the decision is for the jurors to make.
>
> The true rule, therefore, is that a trial judge, in passing upon a motion for directed verdict of acquittal, must determine whether upon the evidence, giving full pay to the right of the jury to determine credibility, weight the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. If he concludes that upon the evidence there must be such a doubt in a reasonable mind, he must grant the motion; or, to state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt, the motion must be granted. If he concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, he must let the jury decide the matter.

*Curley v. United States*, 160 F.2d 229, 232-233 (D.C. Cir. 1947) *cert. denied* 67 S.Ct.

1511.[1]  In the instant action, Roberts' motion is due to be granted as there must be a

reasonable doubt based on the evidence as presented by the Government.


## ARGUMENT

1.  Mack Roberts is charged in Counts 18 through 33.  Each of those counts allege

violations of the honest services mail fraud statute, namely 18 U.S.C. §§1341 and 1346.[2]

2.  Of these 16 counts, 3 relate to the Tuscaloosa Western Bypass (aka Mitt Lary

Road Extension) and 13 relate to Profile Traffic Markings (namely Rainline).

3.  Mack Roberts was Director of ALDOT from January 19, 1999 through June 30,

2001.  Of the 16 counts, 8 occurred after Mack Roberts left office (including Counts 20

and 27 through 33).

### Counts Eighteen through Thirty Three:

### 18 USC § 1341, 1346 - Honest Services Mail Fraud: Historical Background

In 1988, Congress enacted Section 1346 to overrule *McNally v. United States*, 483

U.S. 350, 358, 97 L. Ed. 2d 292, 107 S. Ct. 2875 (1987), and reinstate the intangible

rights theory.  *United States v. Waymer*,  55 F.3d 564, 568 n.3 (11th Cir. 1995)  In

*McNally*, the Supreme Court held that the then-existing mail fraud statute did not

criminalize schemes "designed to deprive individuals, the people, or the government of

---

[1]  In *Jackson v. Virginia,* 99 S.Ct. 2781 (1979) the United States Supreme Court endorsed this formulation as "the prevailing criterion for judging motions for acquittal in federal criminal trials."  *Id.* at 2789 n. 11.

[2]  In the following cases, the Courts have found that Section 1346 is merely a definitional statute, describing one manner of committing the crime of mail, wire or bank fraud, that does not create a new substantive offense.  *U.S. v. Goldberg,* 913 F.Supp 629 (D.Mass 1996); *U.S. v. Caruso,* 948 F.Supp. 382 (D.N.J. 1996); *U.S. v. Hooten,* 933 F.2d 293 (5th Cir. 1991); and *U.S. v. Brennan,* 938 F.Supp. 1111 (E.D.N.Y. 1996).  Thus counts charging violations of §1346 charge violations of a definitional statute and not a federal crime.

intangible rights, such as the right to have public officials perform their duties honestly." *McNally*, 483 U.S. at 358. "When [Congress] enacted . . . [Section 1346] – Congress was recriminalizing mail- and wire-fraud schemes to deprive others of that 'intangible right of honest services, which had been protected before McNally." *Rybicki*, 354 F.3d at 138.

### 18 USC § 1341, 1346 - Honest Services Mail Fraud: Elements

To prove mail fraud, the Government must prove beyond a reasonable doubt that Mack Roberts:

**(1)** intentionally participated in a scheme or artifice to defraud or to obtain money or property by false or fraudulent pretenses, representations or promises; and **(2)** used the United States mails to carry out that scheme or artifice. *United States v. Suba,* 132 F.3d 662 (11th Cir. 1998); *United States v. Waymer,* 55 F.3d 564 (11th Cir. 1995). In addition **(3)** materiality of the falsehood is an element of mail fraud offenses.[3] *Neder v. United States,* 527 U.S. 1 (1999). Finally, the Government must prove **(4)** that the defendant had the specific intent to commit the fraud. *Club Car, Inc. v. Club Car (Quebec) Imp., Inc.,* 362 F.3d 775, 783 (11th Cir. 2004) (mail fraud requires proof of a specific intent to defraud or deceive); *United States v. Hasner,* 340 F.3d 1261, 1269 (11th Cir. 2003). The specific intent required under the mail fraud statute is the intent to defraud. *United States v. Paradies,* 98 F.3d 1266, 1285 (11th Cir. 1996) (noting that mail fraud can be classified as a specific intent crime).

In *United States v. Hasson,* 333 F.3d 1264, 1271 (11th Cir. 2003), the Eleventh Circuit summarized the mail fraud statute as follows:

---

[3] A false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the decisionmaking body to which it was addressed. *United States v. Gray*, 367 F.3d 1263, 1272 (11th Cir. 2004)

> [N]ot all misrepresentations or omissions constitute a scheme to defraud; the misrepresentation or omission must be material and it must be one on which a person of ordinary prudence would rely. . . .  A person of ordinary prudence would not rely on all misrepresentations.  Puffery, for example is not part of a scheme to defraud because a person of ordinary prudence would not rely on it; nor would a person of ordinary prudence engaged in an arm's length purchase rely on the seller's representations regarding the market value of the property when the market value can be and should be, easily verified by consulting other sources.

*Id.* at 1271.

In determining the merits of Roberts' Motion under Rule 29, this Court must ascertain whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.  *United States v. Ward*, 197 F.3d 1076, 1079 (11th Cir. 1999).  Roberts' Motion for Judgment of Acquittal is due to be granted as the Government failed to produce evidence sufficient to sustain a conviction with regard each and every element of counts eighteen through thirty three as set forth above.  Namely, there was no scheme to defraud; there were no materially false or fraudulent pretenses; and there was no specific intent to commit a fraud.


### Good Faith is an Absolute Defense to the Charges in this Case

If there is only one thing that has been established in the Government's case, it is this: Mack Roberts exercised good faith with regard to the projects charged in the indictment.

A.  The Law

Good faith is a complete defense to charges brought under the mail fraud statute. *United States v. Young*, 470 U.S. 1, 32 (U.S. 1985); *United States v. Paradies*, 98 F.3d 1266, 1285 (11th Cir. 1996); *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir. 1981); *United States v. Josleyn*, 99 F.3d 1182, 1194 (1st Cir. 1996); *United States v. Rossomando*, 144 F.3d 197, 199 (2d Cir. 1998); *South Atlantic Ltd. Partnership v. Riese*,

284 F.3d 518, 531 (4th Cir. 2002); *United States v. Wall*, 130 F.3d 739, 746 (6th Cir. 1997);  *United States v. Morris*, 80 F.3d 1151, 1165 (7th Cir. 1996); *United States v. Behr*, 33 F.3d 1033, 1035 (8th Cir. 1994); *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979); *United States v. Migliaccio*, 34 F.3d 1517, 1524-1525 (10th Cir. 1994). "While the term 'good faith' has no precise definition, it means, among other things, a belief or opinion honestly held, an absence of malice or ill will, and an intention to avoid taking unfair advantage of another." *United States v. Migliaccio*, 34 F.3d 1517, 1524-1525 (10th Cir. 1994)  As noted in *United States v. Santoli*, 1999 U.S. App. LEXIS 2204, 6-7 (4th Cir. 1999):

> Good faith on the part of the defendant is a complete defense to a charge of mail fraud. A defendant, however, has no burden to establish a defense of good faith. The burden is on [the] government to prove fraudulent intent and the consequent lack of good faith beyond a reasonable doubt. Under the mail fraud statute, false representations or statements or omissions of material facts do not amount to a fraud unless done with fraudulent intent. However misleading or deceptive a plan may be, it is not fraudulent if it was devised or carried out in good faith. An honest belief in the truth of the representations made by a defendant is a good defense, however inaccurate the statement may turn out to be. . . . The government must establish beyond a reasonable doubt that [the defendant] knew that his conduct as a participant in the scheme was calculated to deceive and nonetheless he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

*Id.*  Mack Roberts' Motion for Judgment of Acquittal is due to be granted as he exercised the utmost good faith with regard to all of his responsibilities as Director of ALDOT but more specifically, Roberts exercised good faith in relation to the projects charged in the indictment, namely Rainline and the Western Bypass.

B.  Rainline

While the prior administration actually began the usage of Rainline, it was Mack Roberts who sought competition for the product and initiated studies of its usefulness and cost effectiveness.  First, a demonstration was set up for the product and approval was

received from the Federal Highway Administration to begin usage of the product.
(Roberts Exhibits 25 and 27)  In fact, the FHWA notified ALDOT that it was "very much
interested in what may be learned" from the usage and study of Rainline.  (Roberts
Exhibit 29)  As this was a relatively new product which could save lives on the highway,
the failure to use and study this product would have been a dereliction of Roberts duty to
provide honest services.  Obviously, in order to study the benefits of this safety product
(which had received four patents), it had to be applied to roadways in the State and after a
period of wear and tear, reviewed for its effectiveness.  Even so, Mack Roberts
consistently requested that competition for Rainline be obtained.  A preliminary safety
study was conducted that showed safety benefits (35% of the sites had a reduction in
crashes) of Rainline which justified its continued use.  (Roberts Exhibit 35)  Mack
Roberts then set up a committee to study five new, innovative, high cost ("propriety")
products, including Rainline, in order to "increase the safety of the motorist ... [and]...
analyze the effectiveness and determine the proper use" of these products.  (Roberts
Exhibit 34)  After studying these products the committee, which Roberts was not a
member of, recommended "that the Department continue use of profiled traffic stripe"
and that "the evaluation, related to performance and safety... should be continued."
(Roberts Exhibit 37)  Under Mack Roberts direction, ALDOT retained the University of
Alabama to conduct a thorough study of this product (the "UTCA Study").  (Roberts
Exhibit 36)  Ultimately, the UTCA Study reported that the usage of Rainline was not cost
effective and its usage was terminated.[4]  This study was begun when Roberts was in
office but concluded one and one half years after he left.  There cannot be a case where a

---

[4]  The UTCA Study is dated November 13, 2003.  (Government's Exhibit 87)
Roberts had resigned as ALDOT Director June 15, 2001 with an effective date of June
30, 2001.  (Roberts Exhibit 77)  Paul Bowlin testified Roberts actually left office around
June 15th and Bowlin became the *de facto* Director.

defendant has exuded more good faith in dealing with a project than Roberts did in the instant action.

C.  Western Bypass

The idea for the Western Bypass of Tuscaloosa was born at least by approximately 1984 and Charles Swann even testified that he had recently discovered a map dated 1969 which included a plan for the Western Bypass.  An ALDOT study of 1990 was utilized by the Tuscaloosa Department of Transportation in 1991 to explain that "the highway will link the population centers along the western edge of Alabama thereby building upon existing economic strength centers within the corridor rather than serving as a mere conduit through an empty territory."  (Roberts Exhibit 100)  During the early 1990s the City of Tuscaloosa, City of Northport, Tuscaloosa County and the neighboring areas sought the manner and means to make the Western Bypass happen.  In March of 1995, the City of Northport passed a resolution indicating that the Western Bypass was its number one project.  When Congress passed a law encouraging public-private ventures as a way to meet the public's long unmet traffic needs, this allowed the long dreamt of Western Bypass to become a reality.  Prior to Mack Roberts becoming ALDOT Director, the Western Bypass was well under way:  Jim Allen had built the Black Warrior River Toll Bridge along with a 1,000 feet of roadway on the south end of the bridge; the Fob James Administration committed the funds to build the interchange at Interstate 59 and connected it to interchange to the Black Warrior River Toll Bridge.  The Mitt Lary Road portion of the Western Bypass is the natural extension of this project which should have been completed regardless of who was the Director of ALDOT.  In fact, there will ultimately be another section added which will connect the Western Bypass with the Eastern Bypass.  Charles Swann testified that this Bypass was the most needed project in the State.  This was a good faith project which began long before Roberts was Director

8

and will be completed long after he retired as such.

Furthermore, despite the fact that this was a needed project and a great project for the State of Alabama and its citizens, Mack Roberts had nothing to do with the three counts in the Indictment charging him with misconduct in regard to the Mitt Lary Road Extension. Paul Bowlin testified that he was the one who signed all three of the agreements made the basis of Counts 18-20. Each of these Counts occurred after Mack Roberts' recusal letter and that Mack had nothing to do with the Mitt Lary Road project thereafter. In fact, Bowlin stated that he handled all the details with regard to these projects after the recusal letter and that Mack Roberts even refused to discuss this matter with him. Despite the fact that this was a greatly needed and beneficial project, Mack Roberts had nothing to do with the conduct complained of in Counts 18-20 of the Indictment.

## There was No Criminal Intent

As a corollary to the good faith defense, the Government's case fails if it does not establish the element of criminal intent beyond a reasonable doubt. As noted above, mail fraud is a specific intent crime. Therefore, the burden is on the Government to prove beyond a reasonable doubt that the defendant had the specific intent to defraud. *United States v. Foshee,* 578 F.2d 629, 634 (5th Cir. 1978) Intent targets "a willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Stephens,* 421 F.3d 503, 509 (7th Cir. 2005). In *United States v. Brown,* 40 F.3d 1218 (11th Cir. 1994) the Eleventh Circuit reversed a mail fraud conviction holding that the Government failed to prove that the defendant was aware that the applications in issue were all fraudulent. Likewise, the Government has failed to prove (or even infer) any

9

criminal intent on the behalf of Roberts.  Whether Jim Allen, Don Siegelman or anyone

else had criminal intent in this matter is irrelevant and cannot be transferred to Roberts.

Each and every count of mail fraud must be dismissed on this ground alone.


## There Was No Scheme To Defraud

Not only must there be a scheme to defraud but also, the United States Supreme

Court ruled in *Neder v. United States* that the government has to prove that the deception

was material.  *Neder v. United States*, 527 U.S. 1, 20-25 (1999).  See also, *United States

v. Brown,* 79 F.3d 1550 (11th Cir. 1996) (convictions were reversed because materiality

was not proven).  There was absolutely no scheme to defraud in the instant action

concerning Mack Roberts with regard to any matter.  More specifically, there was no

scheme to defraud with regard to either Rainline or the Tuscaloosa Western Bypass.  The

focus of the scheme to defraud is on the harms suffered by the victims (and not the

defendants' ultimate goal or purpose).  *United States v. Cross*, 928 F.2d 1030, 1044 (11th

Cir. 1991).  In this case, there was no harm suffered by any victim.  The Government has

not challenged and in fact has admitted that both Rainline and the Western Bypass were

good products/projects.  Moreover, Jim Allen had no interest in Rainline at the time Mack

Roberts was appointed Director of ALDOT.[5]  Rainline was put in use prior to Roberts

becoming the Director of ALDOT.  Furthermore, Roberts, instead of protecting and

promoting the product, encouraged competition, set up studies and even commissioned

the test which eventually lead to the removal of the product from ALDOT usage.  The

---

[5]  Mack Roberts was appointed Highway Director on 1/18/99.  (See Roberts Exhibit 23)  The contract between Jim Allen and Mac Marcato is dated 3/12/99.  (See Roberts Exhibit 26)

Government's witnesses, to a man, said that Rainline was a good product. Jim Allen, Don Vaughn, John Derickson, Paul Bowlin, and Mac Marcato all testified that they believed it was a good product that saved lives. In addition, Jim Allen testified that the contribution he made to the Siegelman campaign was not a bribe and he thought it was a legitimate political contribution.[6] In addition, Marcato testified that he didn't need Jim Allen to get Rainline utilized in Alabama, they had already cleared all those hurdles under the Fob James and Jimmy Butts administration. He wanted Jim Allen to help him take it nationwide. The fact that Mack Roberts became Director actually hindered this plan as neither Allen nor Marcato could utilize Mack's nationwide contacts. Approximately one year after entering into the contract with Allen, Marcato started trying to terminate it.

Finally, Allen testified that at the time he made the contribution he had no interest in Rainline. It appears that Allen knew Roberts liked Rainline (they had used it on their toll bridges) and after learning that Roberts was going to become Director (instead of his choice–Ray Bass), Allen went and cut a deal with Marcato. Regardless, there has been no testimony that Rainline is not a good product. Therefore, there is no harm to the victims, the taxpayers of Alabama but instead a benefit in safety and saved lives. Marcato testified that according to the State of Alabama Crash Facts, during the four years Rainline was utilized there was $2.6 billion in savings due to reduced crashes.

Further, all of the Government witnesses testified that the Tuscaloosa Western Bypass was a good project that was long needed and beneficial to not only the local communities but to the State as a whole. Jim Allen and Frank Courson, both testified to the benefits of the Mitt Lary Extension. They testified that the site was selected because of the terrible traffic congestion, the safety issues and because the local communities had

---

[6] Jim Allen also testified that the decision to make the contribution was "his alone."

been clamoring for such a road for years. The benefits of the road cannot be disputed by the Government as they entered into a stipulation that the bridge and road would help ease the traffic flow in that area. In fact, it was shown that this was a project which was sought out in the 1980's, that the funding and construction were actually initiated under the Fob James administration long before Mack Roberts became Highway Director. Due to Roberts' connections with Allen and Roberts' desire to avoid the appearance of impropriety, he removed himself from the project. Paul Bowlin, Roberts' assistant director, actually signed all three of the funding allotments made the basis of this Indictment (Counts 18-20). Curiously and demonstrating the weakness of their case, the Government did not ask Bowlin any questions about Mitt Lary and objected when Roberts' counsel attempted to. Finally, as Frank Courson testified, once the project was funded, it became a County project, with the County making all the decisions concerning contractors, etc. The State was not involved in the project other than providing the funds. There simply was no scheme to defraud.

Even assuming the Government's theory is true, the acts made the basis of this Indictment as they relate to Mack Roberts are not actionable under any federal statute. The federal mail fraud statute does not purport to reach all frauds. *Schmuck v. United States,* 489 U.S. 705 (1989) "The fraud statutes do not cover all behavior which strays from the ideal; Congress has not yet criminalized all sharp conduct, manipulative acts, or [even] unethical transactions." *United States v. Brown*, 79 F.3d 1550 (11th Cir. 1996) While the Government alleges that the taxpayers of Alabama paid too much for the products in issue, the United States Supreme Court has held that courts will "hesitate to adopt a construction making the difference between legal and illegal conduct in the field of business relations depend upon so uncertain a test as whether prices are reasonable." *United States v. Trenton Potteries Co.,* 273 U.S. 392 (1927) Furthermore, the evidence

unequivocally showed that Alabama paid "much less" than any other State for Rainline and Courson stated that Mitt Lary was a worthwhile project that served a good purpose and was not money simply thrown away.[7]  There was no scheme to defraud and there was certainly no scheme to defraud which is actionable under 18 U.S.C. §§ 1341, 1346.

## The Rule of Lenity and the Mail Fraud Statute

The Mail Fraud statutes are subject to the "Rule of Lenity".  The Rule of Lenity provides that when a criminal statute is ambiguous in its application to certain conduct, the rule of lenity requires it to be construed narrowly and all doubts are to be resolved in favor of the defendant.  *Jones v. United States,* 529 U.S. 848 (2000); *United States v. Trout,* 68 F.3d 1276 (11th Cir. 1995)  The Eleventh Circuit has set aside mail fraud convictions on several occasions, applying the rule of lenity.  *United States v. Brown,* 79 F.3d 1550 (11th Cir. 1996); *United States v. Chandler,* 388 F.3d 796 (11th Cir. 2004).  In *Brown* the Court wrote:

> The law is a causeway upon which, so long as he keep to it, a citizen may
> walk safely.  (Speech of Sir Thomas More in "A Man For All Seasons").
> To be free of tyranny in a free country, the causeway's edges must be
> clearly marked.  The exercise of federal government power to criminalize
> conduct and thereby to coerce and to deprive persons, by government
> action, of their liberty, reputation and property must be watched carefully in
> a country that values the liberties of its private citizens.  Never can we
> allow federal prosecutors to make up the law as they go along.

*Brown,* supra at 1562.  There is nothing to demonstrate that the activities complained of by the Government were clearly marked nor that Roberts conduct contravened any such clear demarcations.  The conduct of Mack Roberts does not fall within the parameters of the mail fraud statute, especially in light of the Rule of Lenity.

---

[7]  Courson went on to state that he had been a good steward of the State's money and not a single nickel was wasted on this project.

<u>**No Personal Gain to Mack Roberts**</u>

There has been shown no personal gain to Mack Roberts from the acts complained of in the Indictment. The $71,000 he received was based upon a settlement of his employment contract and was negotiated prior to Mr. Roberts taking office. Jim Allen testified that this was the closure of the employment contract, that he felt like he owed Roberts something morally for bringing in the bridges on time and under budget, and that this money had nothing to do with Roberts becoming ALDOT Director.[8] It was further negotiated before Mr. Allen had any interest in Rainline and after the Fob James/Jimmy Butts Administration had already committed funds to the Western Bypass. Mack Roberts received no money from Rainline or the Western Bypass. In fact, Steve Arnberg testified that Jim Allen made approximately $38,000-40,000 off of Mack Roberts in the house transaction immediately prior to becoming Director. In addition, Mack Roberts lost out on the opportunity for a $1 million bonus by becoming Director. In order for a mail fraud charge to be viable, there must be some personal gain to the person charged.

> No one can be sure how far the intangible rights theory of criminal responsibility really extends, because it is a judicial gloss on § 1341. Congress told the courts in § 1346 to go right on glossing the mail fraud and wire fraud statutes along these lines. Given the tradition (which verges on constitutional status) against common-law federal crimes, and the rule of lenity that requires doubts to be resolved against criminalizing conduct, it is best to limit the intangible rights approach to the scope it held when the Court decided (and Congress undid) *McNally*. **An employee deprives his employer of his honest services only if he misuses his position (or the information he obtained in it) for personal gain.** Count I does not allege that Bloom did this and therefore does not state an offense under the intangible rights theory.

*United States v. Bloom*, 149 F.3d 649, 656-7 (7th Cir. 1998) (affirming the trial court's

---

[8] It should be noted that Allen was testifying under an immunity agreement which can be voided only for providing false testimony.

dismissal of an honest services mail fraud complaint).  See also, *United States v. Lopez-Lukis*, 102 F.3d 1164, 1169 (11th Cir. 1997) (noting that the personal gain required typically takes the form of kickbacks or failure to disclose conflicts of interest).  Jim Allen gave Roberts $71,000 and a $10,000 truck to close out the employment contract, Allen got $40,000 back on the house transaction and then Roberts forfeited a $1 million bonus.  In addition, Allen lost Roberts (his bridge expert) and got out of the bridge building business.  Marcato lost out on Roberts nationwide contacts with regard to Rainline.  If this was a scheme to defraud, it is mighty strange that all the schemers lost out when Roberts became Director and the only winner was the State of Alabama who received and highly qualified and experienced man as Director.  As Mack Roberts did not personally gain from these transactions there is no deprivation of honest services.[9]

## Denial of Roberts' Severance Motion

Now that we have the benefit of hindsight, Mack Roberts' Motions for Severance should have been granted.  The Government's pre-trial representations including that of a two week trial have been proven to be incorrect and Roberts has been prejudiced as a result.  Mack Roberts moved pre-trial for a severance of his portion of the case from the remaining counts and defendants.  Throughout the trial Roberts renewed this motion on several occasions.  The denial of these motions prejudiced the defendant greatly.  He basically sat in Court for over three weeks without his name being mentioned as the Government introduced evidence of alleged criminal activity against the other three defendants.  If this motion is not granted he will sit through additional weeks of co-

---

[9]  Mack Roberts actually lost money by returning to public service.  He went back to work at reduced pay, quit drawing his retirement, and lost out on the $1 million bonus he had negotiated with Jim Allen.

defendants cases and possibly Government rebuttal. Pursuant to Rules 2, 8(b) and 14 of the *Federal Rules of Criminal Procedure* a severance should have been granted. Rules 8(b) and 14 are designed "to promote economy and efficiency and to avoid a multiplicity of trials [so long as] these objectives can be achieved without substantial prejudice to the right of the defendants to a fair trial. An important element of a fair trial is that a jury consider only relevant and competent evidence hearing on the issue of guilt or innocence." *Bruton v. United States*, 391 U.S. 123, 131 *n.* 6 (1968). Rule 2 of the *Federal Rules of Criminal Procedure*, provides that:

> These rules are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.

The only federal statute that Mack Roberts is charged with violating is Honest Services Mail Fraud. On the other hand, the counts against the other three defendants include: 1) RICO Conspiracy; 2) RICO (alleging predicate act violations of 3) Extortion under Color of Official Right; 4) State law Bribery; 5) Honest Services Mail Fraud; 6) Money Laundering; 7) Conspiracy to Commit Extortion under Color of Official Right; 8) Honest Services Wire Fraud; 9) Obstruction of Justice; 10) Extortion under Color of Official Right and by Fear of Economic Harm; and 11) Fair Campaign Practices Act Bribery); 12) Federal Funds Bribery; 13) Conspiracy; Honest Services Mail Fraud; Honest Services Wire Fraud; Obstruction of Justice; and 14) Extortion under Color of Official Right and by Fear of Economic Harm. Furthermore, the evidence introduced in this case involved matters unrelated to the Alabama Department of Transportation (and therefore Mack Roberts) including the CON Board; alcoholic beverage regulations; waste disposal regulations; hazardous waste fees and taxes; allocation of municipal bond funding; fair campaign practices; and state construction contracting

In *United States v. Blankenship,* 382 F.3d 1110 (11th Cir. 2004) the Eleventh

Circuit spoke directly to this issue when it noted that:

> This case is far too extensive and intricate to expect that a jury would be able to discern the myriad of subtle distinctions and mental gyrations that would be required by the inevitable plethora of limiting instructions necessary. And even where jurors would at first attempt to heed the judge's admonitions, they could hardly be expected to retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence.

*Id.* at 1124. The *ABA Standards for Criminal Justice, Joinder and Severance* § 13-

3.1(b)(1) (1980) provide that a severance should be granted whenever it "is deemed to

promote a fair determination of a defendant's guilt or innocence of each offense".  Under

the facts and circumstance of the instant action Mack Roberts was entitled to a severance

under the principles of law and fairness, and he is entitled to have this motion granted.


### "Honest and Faithful Services" is Not a Federal Criminal Statute

Each and every count of mail fraud charges the defendant with depriving "the

State of Alabama of its right to the **honest and faithful services** of" Siegelman and

Roberts.  However, there is no such crime as deprivation of honest **and faithful services.**

Accordingly, the Grand Jury brought back an indictment for something that is not a crime.

There is no way for anyone to know whether the Grand Jurors thought that Roberts

deprived the citizens of his honest services (a violation of federal law) or his faithful

services (not a violation of any law).  For example, a mother may tell her child they

cannot go out and play until they do their homework and clean their room.  If the child

does his homework (provides honest services) but does not clean his room (fails to

provide faithful services) they have not met the conditions the mother imposed and cannot

play outside.  Similarly, by adding the conjunction "and" and attaching a non-criminal

action, the Government has failed to meet the conditions of a federal violation in the

instant action.

In *Lomelo v. United States*, 891 F.2d 1512 (11th Cir. 1990) the Mayor of Sunrise, Florida was convicted of mail fraud in a pre-McNally trial. Following the release of the McNally decision he filed a 2255 habeas corpus proceeding alleging that since McNally was retroactive, he case should be reversed. The indictment alleged two objects of the scheme to defraud: one under honest services **and** one under a traditional fraud scheme. The Court ruled that use of the conjunctive ("and") rather than the disjunctive ("or") meant that "in order to convict on the basis of the indictment, the jury must have found Lomelo guilty of **both** part (a) and part (b) of Count II." *Id.* at 1516. In Roberts case, the use of the conjunctive "and" renders the indictment void as the Grand Jury (and now the petite jury) would have to find the defendant deprived the citizens of honest services *and* faithful services, the second of which is not a crime.

The honest services provision represents the broadest extension of the mail fraud statute ever enacted. In *United States v. Adkinson*, 135 F.3d 1363 (11 th Cir. 1998), the Government persuaded the Grand Jury to return an indictment on a conspiracy count for which 4 of the 5 conspiratorial objectives were not violations of the law. The Eleventh Circuit held that to be reversible error.[10] The court noted, "[i]n order to be valid, an indictment must allege that the defendants performed acts, which if proven, constitute the violation of law for which they are charged". Further "[a]n indictment should be tested against the law 'as we find it on the date of our decision.'" *Adkinson* at 1372. Here the indictment has a plain defect in that it can be construed to allege circumstances which do not constitute a criminal offense. The Grand Jury returned an indictment which does not

---

[10] The Eleventh Circuit reversed the case despite the fact that "the trial lasted five months; 115 witnesses generated more than 85 volumes and 17,500 pages of transcript; 1,447 exhibits were admitted." *Adkinson*, supra at 1369.

state a violation of federal law. Any conviction by the Trial Jury in this case would be clear error also. As the United States Supreme Court has stated "if a jury convicts on a count containing insufficient grounds, the conviction cannot stand since the verdict may have rested on the insufficient ground." *Zant v. Stephens*, 462 U.S. 862, 881, 103 S. Ct. 2733, 2745, 77 L. Ed. 2d 235 (1983).

Further, special scrutiny should be applied to the any extension of the elements of 18 U.S.C. § 1346 as was done in this indictment. 18 U.S.C. § 1346 is, of course, a broadening of the mail fraud statute in that it eliminated the requirement of a tangible loss to sustain an offense under the mail fraud statute, and instead caused a deprivation of so-called "honest services" to form the basis of a conviction. See generally, Blumel, Ryan *Mail and Wire Fraud,* 42 American Criminal Law Review 677, 682-83 (2005). Thus, the additional term "and faithful" in the indictment is fatal because it amounts to an extension beyond the outermost limits which Congress has proscribed. Criminal statutes are to be construed strictly in favor of the accused. *See United States* v. *Lallier,* 520 US. 259, 266 (1997).

## There is No Vicarious Liability

The Eleventh Circuit in *United States v. Brown,* 79 F.3d 1550 (11th Cir. 1996) has ruled that there is no vicarious liability under the mail fraud statute. Each person must willfully participate in the fraudulent scheme. *Id.* The Court held:

> We know that no criminal vicarious liability is authorized under the mail fraud statute. *U.S. v. Toney,* 605 F.2d 200, 208 (5th Cir. 1979) ("participation by a business entity in a scheme to defraud in no way necessitates a finding that the officers were participants in that scheme"). Instead, the evidence must show that each officer, the person, "willfully participated" in the scheme. *U.S. v. Sawyer,* 799 F.2d 1494, 1502 (11th Cir. 1986).

*Id.* at 1556 n.9. In *Brown,* the defendants convictions were reversed with a holding that

each individual person must themselves willfully violate the mail fraud statute to sustain any conviction.  In this case there is no evidence that Roberts willfully participated in any alleged scheme.  Roberts cannot be held liable vicariously for any actions of Allen.

## A Bribery Scheme With No Quid Pro Quo

The scheme to defraud as alleged in the indictment is a bribery scheme.  Counts 18 through thirty-three contain the counts against Mack Roberts.  Paragraph 70, within those counts specifically incorporates Paragraphs 44-45 of the Indictment.  The Purpose, Manner and Means of the scheme as set forth therein is a bribery scheme and the Government specifically asserts that certain actions were taken "in exchange for" other actions.  "For a bribery there must be a *quid pro quo* – a specific intent to give or receive something of value *in exchange for* an official act."  *United States v. Sun-Diamond Growers of California,* 526 U.S. 398, 405 (1999).  Even if this is deemed to be a bribery case, there is a *quid pro quo* requirement.  *McCormick v. United States,* 500 U.S. 257 (1991); *United States v. Martinez,* 14 F.3d 543 (11th Cir. 1994).  There was no *quid pro quo* in the instant action.  In fact, Jim Allen even stated explicitly there was no bribe, he thought he was making a legitimate campaign contribution.  Further, Allen did not even have an interest in Rainline at the time of the payment or at the time Roberts was made Director.  Roberts specifically adopts as herein set forth the arguments of Governor Siegelman in this regard.

## The Honest Services Mail Fraud Statute Is Unconstitutionally Vague

The Second Circuit has ruled that Congress' provision regarding honest services mail fraud is unconstitutionally vague.  In *United States v. Handakas,* 286 F.3d 92, 112-

13 (2nd Cir. 2002) the Court ruled that the "honest services" provision of 18 U.S.C. §
1346 was unconstitutionally vague because the statute did not provide fair notice that
federal law had criminalized breaches of contract and failed to provide standards for
enforcement.[11]  The vagueness issue was raised in the Eleventh Circuit in *United States v.
Waymer,* 55 F.3d 564 (11th Cir. 1995).[12]  The Eleventh Circuit stated that the analysis of
the claim is based on the particular facts of the case.  *Id.* at 568.  The Court denied
Waymer's claim finding that the Government had established beyond a reasonable doubt
the specific intent to defraud.  *Id.* at 568-9.  There is no such proof in the instant action.
The actions taken by Mack Roberts included the utilization of a product that improved the
safety of the roads for Alabama drivers and also the citizens of the Northport/Tuscaloosa
area.  They were not illegal in any way and there is absolutely no evidence of any specific
intent to defraud.  Such activities are not illegal and therefore, if this statute encompasses
them, it is void for vagueness.

<u>**The Government Was Allowed To Ask**</u>
<u>**Improper Character Questions On Cross-Examination**</u>

    Mack Roberts called six character witnesses to testify in his case.  With regard to
several of these witnesses, the Government, over Roberts' objections, was allowed to ask

---

    [11]  In the interest of full disclosure, *Handakas* was overruled in *Rybicki*, but not
with regard to the merits of the vagueness claim.  Rybicki held: "[t]here was thus no
reason to reach the constitutional question in Handakas. In light of our duty to avoid
passing on constitutional questions whenever possible. . . we overrule the unnecessary
constitutional ruling in that case without reviewing it on its merits."  *United States v.
Rybicki*, 354 F.3d 124, 144 (2d Cir. 2003).

    [12]  To avoid being unconstitutionally vague the criminal statute must "define the
criminal offense with sufficient definiteness that ordinary people can understand what
conduct is prohibited and in a manner that does not encourage arbitrary and
discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) as cited in
*Waymer,* at 568.

improper hypothetical questions which assumed the Defendants' guilt. Such questionins is improper and prejudicial to the Defendant's case. In *United States v. Guzman*, 167 F.3d 1350 (11th Cir. 1999) the Eleventh Circuit held that such questioning was improper. The specific question asked in *Guzman* was: "Mr. Borras, would your opinion change if you learned that, in the summer of 1993 Ms. Guzman was involved in transporting multi-kilogram quantities of cocaine?" *Id.* at 1352. The Government asked identical questions in the instant action of several of Roberts' character witnesses. In *Guzman* the Eleventh Circuit condemned this line of question and held as follows:

> The government may not, however, pose hypothetical questions that assume the guilt of the accused in the very case at bar. 'These [guilt-assuming] hypotheticals [strike] at the very heart of the presumption of innocence which is fundamental to Anglo-Saxon concepts of fair trial. Although the questions at issue in *Candelaria-Gonzalez* were posed to character witnesses who were testifying to the accused's reputation in the community, these questions are equally inappropriate when asked of opinion character witnesses.

*Id.* at 1352. Unlike *Guzman's* single question at issue which was asked to one witness, the Government in Roberts' case was allowed to ask multiple questions to at least two witnesses, over defense counsel's objection. This was improper and prejudicial to Roberts.

## Additional Specific Grounds for Roberts' Motion for Judgment of Acquittal

1. As a further example of why this motion should be granted. Of the 16 counts, 8 occurred after Mack Roberts left office (including Counts 20 and 27 through 33). Accordingly, Roberts was a private citizen when the events in at least 8 count of the counts occurred. However, the second superseding indictment charges Mr. Roberts with violation of a duty as a public official, as opposed to a duty to as a private citizen. The

Eleventh Circuit has drawn a clear distinction between these two kinds of honest services cases. *United States* v. *deVegter,* 198 F.3d 1324, 1328 and n.3 (11th Cir. 1999) (distinguishing between a charge that a defendant "deprived the *public* of honest governmental services" and a charge that he "deprived *Fulton* County of honest *commercial* services by providing corrupted financial advice") (emphasis in original). Two federal courts have held that private citizens, cannot be charged or convicted under § 1346 for depriving the public of their own honest *governmental* services. *United States* v. *Murphy,* 323 F.3d 102, 113-18 (3d Cir. 2003); *United States v. Warner,* 292 F. Supp.2d 1051, 1063 (N.D. Ill. 2003). Those courts held that private citizens owe no duty of honest governmental services to the public in the first place, and thus cannot be charged with or convicted of violating such a duty. *Id.* These decisions and the Eleventh Circuit's decision on a similar issue in *United States* v. *deVegter,* 198 F.3d at 1328-30, compel the conclusion that Mr. Roberts cannot be charged under the circumstances of this case.

*DeVegter* drew a distinction between public actors and private actors for purposes of honest services fraud, and imposed more stringent source-of-duty requirements on the prosecution when dealing with private actors.

> The meaning of the "intangible right of honest services" has different implications, however, when applied to public official malfeasance and private sector misconduct. Public officials inherently owe a duty to the public to make governmental decisions in the public's best interest.... On the other hand, such a strict duty of loyalty ordinarily is not part of private sector relationships.... Most private sector interactions do not involve duties of, or rights to, the honest services of either party. Relationships may be accompanied by obligations of good faith and fair dealing, even in arms-length transactions. These and similar duties are quite unlike, however, the

duty of loyalty and fidelity to purpose required of public officials.

*United States* v. *deVegter,* 198 F.3d 1324, 1328-30 (11th Cir. 1999). Roberts specifically adopts the argument of Paul Hamrick as if herein set forth. For these reasons alone, Roberts respectfully requests that the Court dismiss each of these honest service charges to the extent that they involve acts allegedly committed while he was a private citizen.

2. Defendant adopts and incorporates as if herein set forth each and every ground previously asserted by this defendant in his Motion for Severance, Brief, Reply Brief and those grounds asserted in open court at the hearing on that motion and asserts that it was error for this Court to deny this Motion. Furthermore, defendant re-asserts each additional ground that was raised during the trial of this matter and asserts that it was error of this Court to deny these Motions.

3. Defendant adopts and incorporates as if herein set forth each and every ground previously asserted by this defendant in his Motion for Bill of Particulars, including those asserted in open court and asserts that it was error for this Court to deny this Motion.

4. Defendant adopts and incorporates as if herein set forth each and every ground previously asserted by this defendant in his Motion for a Daubert (Or Qualification) Hearing Concerning Experts Identified by the Government or in the Alternative Motion to Exclude and Memorandum of Law in Support Thereof, including those asserted in open court and asserts that it was error for this Court to deny this Motion.

5. Defendant adopts and incorporates as if herein set forth each and every ground previously asserted by this defendant in his Motion for a James Hearing to Determine the Admissibility of Statements, including those asserted in open court and asserts that it was error for this Court to deny this Motion.

6. Defendant adopts and incorporates as if herein set forth each and every ground

previously asserted by this defendant in his Motion to Dismiss, including those asserted in open court and asserts that it was error for this Court to deny this Motion.

7.  The defendant reasserts each and every motion and objection to which he has received an adverse ruling both pre-trial and during the trial as if herein set forth.

8.  The defendant reasserts each and every motion and objection to which any co-defendant has received an adverse ruling both pre-trial and during the trial.

9.  The defendant moves that a Judgment of Acquittal be entered as to each count of Honest Services Mail Fraud under 18 U.S.C. §§ 2, 1341 and 1346 because the Government has presented no legal evidence, as to each and every element of these charges from which the jury could find the defendant guilty beyond a reasonable doubt.

10.  The defendant incorporates all issues raised orally or in addition submitted in writing at the hearing on this and any other motion.

11.  There is insufficient evidence to sustain a conviction with regard to Counts 18 through 33 of the indictment.  The government has failed to prove each and every element of 18 U.S.C. §§ 2, 1341 and 1346 to the degree required by law.  More specifically:

> a).  the Government has failed to prove to the degree required by law, that the defendant intentionally participated in a scheme or artifice to defraud or to obtain money or property by false or fraudulent pretenses, representations or promises;

> b).  the Government has failed to prove to the degree required by law, that the defendant used the United States mails to carry out that scheme or artifice;.

> c).  the Government has failed to prove to the degree required by law, materiality of the falsehood;

> d).  the Government has failed to prove to the degree required by law, that

the defendant had the specific intent to commit the fraud (specifically that

Roberts had the specific intent required under the mail fraud statute, that is

the intent to defraud).

12. That 18 U.S.C. § 1341 and 1346 is unconstitutional to the extent that it would

make a crime of activities which are beneficial to the State of Alabama and the citizens

thereof. Furthermore, the product and project made the basis of this suit are admitted to

be good for the State of Alabama and the citizens thereof. As such, these statutes are

overly broad and a denial of the defendant's due process and equal protection rights. They

are being applied in this case to make completely legal conduct illegal.

13. That 18 U.S.C. §§ 2, 1341 and 1346 are unconstitutional to the extent that they

are being used to make criminal activities out of activities in no way harm the system, the

State or its citizens. As applied in this action they encompass legal activities and make

them criminal.

14. That 18 U.S.C. §§ 2, 1341 and 1346 are unconstitutional as being vague.

More specifically:

a). they do not give fair warning of the standards by which a persons conduct is to

be judged;

b). they are further unconstitutional in their application to the defendant in this

case;

c). they fail to give reasonable notice of the required conduct to one who should

avoid its penalties, *Boyce Motor Lines, Inc v. United States*, 342 U.S. 337 (1952);

and

d). they infringe on the defendant's constitutional liberties.

15. The defendant is entitled to a Motion for Judgment of Acquittal because of a

failure of proof in the government's case. The government has failed to proof by the

26

required measure of proof that the defendant has committed any crime charged in the indictment.

16. It was error for this Court to deny the defendants' challenge for cause to juror number 18 in the jury venire. This juror exhibited clear bias that equalled or exceeded the bias of other jurors who were dismissed for cause. This required the defendants to use one of their peremptory challenges to remove this juror who should have been struck by the Court.

17. There was insufficient evidence from which a reasonable jury could be convinced beyond a reasonable doubt that there was any mail fraud in that the circumstantial evidence presented was inconsistent with an obvious and reasonable interpretation of the evidence.

18. Insufficient evidence was presented from which a reasonable jury could be convinced beyond a reasonable doubt that Mack Roberts aided or abetted any other person to commit mail fraud.

19. Error was committed by allowing the testimony of Billy Stinsen and Gary Moore over defendants' objections. This testimony was irrelevant to the issues in the case and the prejudicial effect outweighed its probative value. It involved issues (namely Burk-Kleinpeter) which is not part of the indictment. Furthermore, Roberts filed a Bill of Particulars requesting the issue of what "business interests" the Government intended to go into, the Government's response did not reveal this as one of the interests. None of the documents the Government sought to introduce were provided in discovery nor pre-marked as exhibits. The first mention of this area of testimony was brought out by the Government when it attempted to impeach its own witness (Jim Allen) on re-direct examination. It involved a collateral matter. It is in effect 404(b) testimony which the Government stated in pleadings that it was not going to utilize any 404(b) proof. It

involved another breach (at least the 10th) of this scheduling order concerning the disclosure of witnesses, and all in the case in chief.

20.   The error explained in paragraph 19 above was compounded when the trial court limited the defendants' cross-examination by refusing to allow them to inquire into relevant areas such as the committee members who approved contracts and contractors, other contracts and contractors who were approved and recommended to Roberts as Director under the same procedure and the contents of Exhibits 314, 315 and 316.  The Court improperly would not allow records, admissible as business records, to be introduced through the records custodian because the witness did not attend the meetings identified in the records.  This is extremely prejudicial.  It amounts to a denial of the defendant's Constitutional right to a thorough and sifting cross-examination.  It is a violation of the Rule of Completeness and unfairly inhibited Roberts defense.

21.   The trial court committed error by its rulings concerning whether the parties were allowed to inquire, on cross-examination, concerning matters outside the scope of direct examination.  For example, in the Government's case, Defendant Roberts allowed to question Paul Bowlin concerning the Mitt Lary Road extension.  In fact, Roberts was required to recall Paul Bowlin in its case in chief because he was the head ALDOT official dealing with this part of the case.  Nevertheless, when Roberts objected the Government asking questions of his defense witnesses, claiming they were outside the scope of direct, this Court reversed its prior rulings and allowed the Government to continue questioning outside the scope of direct.  Not only were some of these matters outside the scope of direct but they were cumulative as the Government asked questions concerning Rainline that they had asked the first time Bowlin testified.  Such rulings were inconsistent and unfair and in violation of Roberts due process and constitutional rights.

22.   The Government unfairly prejudiced this case by injecting improper

prejudicial comments through "speaking objections." Despite the fact that this Court repeatedly told them to stop, these prejudicial comments begin the first day of trial and continued through the last day of trial. This continuing barrage of improper comments prejudiced Roberts in this matter.

23. Defendant Roberts adopts as if here set forth the Motions for Judgment of Acquittal filed by the other Defendants in this matter. This specifically includes not only the motions (written and oral) made at the close of the Government's case but also the motions (written and oral) made at the end of all the evidence.

24. As additional grounds, Defendant Roberts raises the failure this Court to rule on the Defendant's Motion for Judgment of Acquittal at the close of the government's case. Roberts specifically requested this Court to do so "in order to avoid waiving the right to challenge the strength of the government's evidence alone." This Court's failure to do so prejudiced Roberts.

WHEREFORE, the Defendant is entitled to entry of judgment of acquittal on his behalf on each and every count in the indictment and requests this Court to enter an Order granting this Motion.

Respectfully submitted


_____/s/David McKnight_____
William J. Baxley
David McKnight
Joshua Briskman
Attorneys for Gary Mack Roberts
BAXLEY, DILLARD, DAUPHIN,
      MCKNIGHT AND BARCLIFT
2008 Third Avenue South
Birmingham, AL 35233
Telephone: (205)271-1100
Fax: (205)271-1108
Email: dmcknight@bddmc.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 13th, 2006, I filed a copy electronically to be served upon all counsel of record through the CM/ECF system.

<u>      /s/David McKnight                  </u>
Of Counsel